Next case on our docket today is the case of James Becherer and Tri-County Feed Mill v. Qwest Communications International. And we have Mr. Chris Koenig for the appellant and Dan Malia, the athlete. And whenever you're ready to proceed, you may. Good morning. Good morning. My name is Chris Koenig and I represent Petitioner Qwest in this matter. We are here today because the Illinois Supreme Court issued a supervisory order directing the circuit court to certify three questions for appeal. All of the questions concern the propriety of the circuit court's order, certifying a class of some 12,500 class members over more than 1,300 miles of railroad right-of-way in eight different states. The primary issue that must be decided at trial in this case is whether Qwest trespassed on the land of these class members by installing fiber-optic cable in the railroad's right-of-way adjoining the class member's property. So a core issue is who has title to the right-of-way. Is it the class members or is it the railroads? Of the three questions that the Supreme Court certified, the most important one is whether predominance of common issues can exist if the claims of the proposed class require the title to land for each class member be determined. The answer to that question is no. In Illinois, under Smith v. Illinois Central, the predominance test is whether common or individual issues will be the object of most of the efforts of the litigants in the court. There are, I think the parties agree, four main issues in this case. First, fee versus easement. Second, scope of easement. Third, the class member's property rights. And fourth, damages. Each of these issues is highly individualized and will take enormous time at any trial. The first issue, fee versus easement, concerns whether a railroad has a fee interest or instead merely an easement in the right-of-way. And this is a critical issue because, of course, if the railroad has a property right in fee, the class member doesn't own it and there can be no trespass claim. But plaintiffs say that these property rights acquired by the railroads were required in three different ways. Private deed, condemnation decree, and by federal land right. I think that's an oversimplification, but I won't quibble with it except to point out that in these eight states with respect to Quest, almost all of the land was acquired in the first two ways, private deed or condemnation decree. Now, the deeds by which the railroads acquired the right-of-way were almost all created in the last half of the 19th century, which is when railroad traffic lay in these eight states for the most part. And so, plaintiffs told the court that this universe of deeds in eight different states are fundamentally all alike. They're fundamentally all unambiguous. And therefore, the court could construe almost all of them uniformly and determine whether a fee or an easement was granted. But here's the thing. Plaintiffs did not give the court below a single deed to support that assertion. Not one. We know it's untrue. And in fact, the Illinois Court of Appeals has held in Diaz that deeds are sui generis and they must be interpreted on their own terms. These are not generic deeds. They're not cookie-cutter. And we know it because Quest submitted to that court below several hundred deeds. And as you can imagine, in the 19th century, these were individually negotiated with individual landowners. They were negotiated by different individuals walking across these eight states using their own language. They worked for different railroads. And so, of course, they're going to be unique. Do the plaintiffs concede that if your clients or if the railroads had a fee interest through a deed that that would defeat their claim? Yes. And that's why this is such an important issue. And the only way to resolve it is by looking at the individual deeds. Now, it's not merely that these deeds are different. It's the language in the deeds that differs that matters to the fee versus easement. And how does it matter? Because some would be a fee simple absolute or various degrees of ownership or proprietary rights? All different kinds, depending on the precise language. And in some instances, it simply says strip of land, a piece of ground. Sometimes that would be followed by a phrase like for railroad purposes or for right of way. Sometimes it wouldn't be. Sometimes those latter phrases would not appear in the conveyance language, but rather would say I'm conveying a fee interest, excuse me, a tract of land. But if a railroad doesn't use it for railroad purposes or prefers that, the variations are innumerable. And to determine which it is, what kind of fee and everything else, you have to look at the individual deeds. So on those situations where there would not be a fee simple absolute interest, however it's told there, your clients would owe something to some of the landowners, some of the class of plants. No, not necessarily. And I'll get to that point. But that's the scope of the easement question. If it's not a fee but instead an easement, there's this whole second issue which I will address, which is what is the scope of the easement that was granted? Before you go there, you said you presented a couple hundred deeds. Yes. And what was the upshot of that? Did you argue from that to the court? Yes. Were they put into the record? They're in the record. Okay. And can you summarize what you attempted to show by these? Certainly. And it's frankly the point I just made, which is the language differed from deed to deed. And that therefore under Illinois law and under the law of the seven other relevant states, you had to look at that language. That's the DS case individually to parse it. And there was an illustration we gave, which is the instance of one of the two main plaintiffs, Fife County Feedland. The relevant deed in that case is an 1857 deed. And the deed says that Mr. Nichols quit claim to the Ohio Mississippi Railroad, quote, a certain strip of land 100 feet in width. Now, here's what plaintiffs said at page 33 of the brief they submitted to you. Quote, it is settled throughout the United States that a private complaint to a railroad that purports to convey a strip or parcel of land conveys a fee. Well, that would seem to be the end of Tri-County's claim. It conveys a strip of land. That's only a fee. Therefore, there's no trespass on Tri-County's land. But that was in the part of the brief where they were trying to convince you that these could all be uniformly interpreted. How could it be simpler? If it says strip of land, it's a fee. Later, they're trying to salvage Tri-County's claim because we point out that very point. And they say, no, no, no. You have to look at other language in the deed. And they say, quote, this is the plaintiff's. And I agree. Limiting language in a deed is critical to an analysis of the railroad's interest. And so they then go to a different part of the deed, which is this language of revert, saying, okay, you've got a strip of land, but you have to give it back. It's not used for railroad purposes. But that's not a fee simple, then. Well, it is. It is? Yes, it still is. When you use the word fee, you're talking about fee simple absolute? Well, this would be a fee simple determinable. Okay. I apologize. Now we're getting tricky. Right? Right. But that's the very point, is that you have to look at the precise language. And that's the point plaintiffs themselves make when they're trying to keep that claim alive. Well, so each deed is sui generis. Each one has to be looked at in its own terms. There are thousands. Looking at the second major category, condemnation decrees, it's basically the same thing. In the first part of the brief, plaintiffs say, if it's a condemnation decree, it's an easement. But then later, we point out, and they admit, that there's at least one exception to this, which is Illinois, in 1852, enacted a statute that allows for condemnation and allows the railroad to obtain a fee. So, it's simple. If it's a condemnation decree, it's a fee. It's inaccurate by their own ambition in Illinois. And then they say, oh, wait a minute, now you hear what you have to do for this. And I quote him very briefly, which I agree with. You have to have the detailed analysis of the circumstances of each condemnation decree. And you have to examine both what the railroad sought in its petition and what it actually obtained in the decree. And you have to look at the amount the railroad had paid. You have to look at the individual decree. That's our point. These are individual issues. Now I'd like to turn to the second issue, the one that you questioned me about, which is the scope of an easement. Even if it is an easement, the easement might be broad enough to cover installation of cable. Now, on this issue, too, plaintiffs submitted what they called a motion for summary judgment on scope of railroad easements. On its face, this asks for an adjudication by the circuit court whether the scope of an easement covers installation of cable. Once again, plaintiffs did not submit a single scrap of evidence, a single deed, a single easement. How can you construe an easement without the easement? Well, this wasn't oversight by plaintiffs. They specifically said that, quote, no factual record is relevant to this summary judgment motion. This is the Illinois Court of Appeals held in Ralston that motions for summary judgment must be based on facts. They also say that the precise language I'm quoting of a particular instrument is irrelevant to the scope of the easement. The Illinois Supreme Court held in the Walbaum case that we cite that, quote, the specific words used are – the court must analyze the specific words used in a deed, and none of the words are considered meaningless. So here, too, we're in the same spot. The plaintiffs don't give the court the documents. And if you look at the documents, you have to look at the specific words used. The third issue is class member's property. It does not follow. Even if there's a railroad that gets only an easement, and even if the easement is not broad enough, the plaintiff still has to – the class member still has to show that he or she owns the property. And since the plaintiffs have the burden of showing these are all common issues, you would have thought they would have submitted some title documents to show, look, if you prove this for these class members, you can prove it for the other 12,000. Well, it's ridiculous. I mean, if you own your home, that doesn't help me prove that I own mine. These are separate issues. And not only are they separate, but they're complex. The reason they're complex is that you often have to go through the whole chain of title, and it's often the early documents that tell you whether or not the current owner of land owns the right-of-way if the railroad does not. The example – Somebody has to own it, though, right? Somebody owns it, right. And wouldn't that somebody be presumably a member of the class that they're wanting to get certified? Well, not necessarily, because the class is defined – Unless it's the government or something. If the class is defined as a joint clause. So it doesn't necessarily include, and so there has to be proof that they're also underlined. And frankly, we've only got two plaintiffs here, and one of them has this problem. As we point out in our brief, Tri-County bought its interest in the land in 1986. 130 years earlier, Mr. Nichols conveyed the parcel to someone and had executed the deed which said, we're conveying everything except, quote, in the boundary and limits of the Ohio-Mississippi Railroad, being the land given for the right-of-way for the set railroad. Now, under Illinois law, obviously the intent governs, and it couldn't be more clear that you're accepting from that deed, that the railroad right-of-way. So, what we know is Tri-County does not have an ownership interest, and that's the main plaintiff in this case. Now, if you look back and think what is going on here, you see that the plaintiffs have put up this big curtain. And in front of it, they try to project this image, this large, common image, easily answered questions. But if you pull back the curtain, even a little, if you just look at these two main plaintiffs, you see, this isn't so simple. I mean, to decide the claims of the two main plaintiffs, we had to look at five warranty deeds, a quit-claim deed, three agreements, two condemnation statutes, and a receipt from the Clinton County Treasurer's Office back in 1882. So, the issues are highly individualized. If you look a little further and look at the two or three hundred deeds that we presented, you can see that it's even more difficult. And you can see that this image of a unified issue is simply an illusion. The picture is you actually have to try this case. And there are 12,500 individual class members who have individual deeds and condemnation. Couldn't you just look, simplify, look at the tax records of individual counties and who's been assessed property tax for all this land for all these years? And that's some indication of who would own it? Well, that's how we ended up finding out who's in the class, which is a class of adjoining property owners. That's correct. So that's relative. I mean, well, somebody's got to be paying tax on the right-of-ways. Correct. And the railroad, obviously, is paying. And I don't know, Your Honor, frankly, whether in which instance, and it may well be this is an individual issue as to who is paying on the right-of-ways as opposed to the adjoining property. But that would be a rather simple way or a simpler way to do it than going back through the abstracts of all these deeds and what have you there, would it not? Well, it would not actually establish ownership. I mean, someone might be improperly or unnecessarily paying taxes. The ownership interest would be established by a chain of time. And, of course, that's a separate issue, Your Honor, from the issue of whether or not this easement, whether the railroad got a fee. If it had a fee, then they have no claim whether they've been paying taxes on it or not. And, in addition, if they have an easement that's broad enough, they still can't prevail whether or not they've been paying taxes. But does the railroad pay property taxes on all the property that it doesn't have a fee in but just has an easement on? I apologize, I don't know the answer to that. And the fact that there are complicated and confusing records in and of itself should defeat the certification. If there's a common question, the common question is, were property rights ignored and was the cable installed? And to go through all the analysis is what takes a long time. Well, there is not any dispute that the cable was installed. So it's a common issue, but one that will take zero time to trial. And as to whether or not, I mean, whether or not there has been a trespass, you can't decide in any respect until you answer these three questions that I would just walk through. So that as to any individual class member that cannot be in covering absent proof of this is merely an easement, not a fee, proof that this easement isn't sufficiently broad under the law of the particular state and under the words of the deed or the decree. And then similarly, proof that this particular class member owns the property. Undisputably, there's been these rails-to-trails lawsuits, hash. Right. How do you distinguish hash? It was one state, right? It was one state. I mean, these are eight states, many, many counties. But beyond that, these individual issues of private ownership, who's the owner, is not. The principal issue in an abandoned railroad case is simply was the rail line abandoned? And that is not an issue here. Instead, it's this individual issue of was it a fee or an easement? So the ownership is not involved in the rails-to-trails type cases? The issue of abandonment is the principal issue, yes. Okay. So they don't examine the type of ownership or title that was transferred? I don't believe they do. And the multi-state issue is, I'm going to just, my gut is irrelevant because if I'm looking at California, for example, and comparing it to New England, which is nine states, it doesn't matter. You're still looking at the same number of documents. You're trying to analyze who owns it and how they own it or if they own it. So I don't distinguish hash simply because it was a one-state issue and this is eight. Well, I actually believe that we point out in our brief that the law differs in these eight states. So if there's one state, then you don't have as many to deal with. I mean, we have punitive damage issues here, and we go through the fact that some states actually require that this issue be bifurcated and tried separately, the compensatory versus punitive, that the interpretation, of course, in Illinois court is not going to be looking. But you're saying that the normal choice of law between states wouldn't be applicable to this case because you couldn't just center on one state's real estate law or property law. Exactly. Okay. That's exactly right, and that adds a level of complexity to these issues, enormous complexity. We've talked only about the liability issues, but the damages issues are also incredibly complex and difficult. Plaintiffs propose kind of a uniform method, one size fits all, for it wouldn't matter whether the land is rural or commercial or industrial or residential. It wouldn't matter whether the request to pay different amounts to different railroads for the right-of-way. It wouldn't matter whether this is an integral part of the network or a redundant part. There would be one size fits all. Well, the court didn't analyze the issue, but it accepted it. Seven other courts that we cited in our brief, pages, opening brief, pages 26 through 28, have looked at this very issue and have concluded that, in fact, this is an improper method of calculating damages, that you have to look parcel by parcel. And so the damage case as well would be one where there would be highly individual issues. So no matter what facet of this case you're looking at, whether it's proof of liability, proof of damages, you end up with these enormous individual issues that will consume substantial time in trial, substantial time of the court. And for those reasons, we submit that this case should never have been certified. The questions that the Supreme Court has certified should be answered in the negative, and that the last certification order should be revoked. Thank you, Mr. Kagan. You're finished with your time? With my time, I have rebuttal. You have rebuttal. Mr. Malia? Malia. Malia. May it please the Court, good morning. Good morning. At the outset, I want to focus on three defects in the arguments that Quest has made today, and that Quest made in more detail in its brief. And after that, I'll zero in on the predominance and manageability issues that I think are central to Quest's appeal. First, the factual history. Quest pretends in its brief that the facts behind this entire problem are not particularly relevant, not really contested, and should be of no moment in this appeal. That is just not the case. Quest's conduct here is absolutely outrageous. Today, like other telecoms in the 1980s with AT&T and the 1990s for Quest in Level 3 and Sprint, all of them have faced class action around the country for this problem. They installed a national network which was designed to generate tremendous profits, and it did. They did that at the expense of thousands of landowners, ranchers, farmers, homeowners. What does that do with the rightness or wrongness of the certification? Glad to get to that point, Your Honor. Quest's white-papy approach that only individual issues are really at play here in Illinois is clear. You've got to look at what will be the focus, the time and effort of counsel and the court. Where will that time and effort be focused? And they suggest this factual background isn't going to take any time at all. We put the cable in, end of story. That's not the end of the story. The story we're going to tell at trial, and we'll have Quest corporate witnesses and an array of Quest documents, many of which we've seen already in discovery, but discovery isn't even completed yet. We'll demonstrate to the judge and to the jury they knew what they were doing. They knew they didn't have the right to do it. They knew they had to do it because they couldn't compete in this market, in this industry, unless they got this network in the ground quick and started selling capacity. And they took those property rights when they knew the only way to determine where they had the right to do it and where they lacked the right to do it. They would have to go through parcel by parcel and analyze. Does the railroad own it in fee or is it just an easement? If it's just an easement, who owns it? Who do we have to negotiate with and what are we going to have to pay them? They didn't have time to do that. They wouldn't do that. That, we believe, warrants punitive damages, and it also demonstrates that this was a concerted effort, a nationwide effort directed at all of these Quest members. We'll spend a lot of time in trial developing those facts and proving that case. That will be important. And that's why that common set of facts is important to this appeal because that is a predominant common issue. Common issues don't have to be legal issues. They can be factual issues. And that comprehensive nationwide course of conduct is central to this case and central to the issue of Quest certifications. Second defect. You'd have to show, I mean, their counterargument would be, well, okay, show us the liability for all these people. They will definitely offer that defense, that we have to independently, individually prove the liability for each Quest member. That goes to the manageability question, which I will get to in a second, in response to much of what Mr. Koenig said. The second defect issue I want to focus on briefly is that the legal issue is in play and the case management issue has been misconstrued by Quest. Now, I was there when the court certified. I was there for the class certification hearing. Mr. Koenig wasn't even class counsel at the time. It was over seven years ago. He has misrepresented in his briefs and in his argument what we want the court to do, the circuit court, and what we believe the circuit court intended to do after certifying. Our approach, as I'll explain in a minute, demonstrates how you can take the common issues, focus on those issues at the outset, and simplify the case. It isn't going to be a simple case. It's going to take time, and it's going to take a lot of work, but it isn't the impossible case that Mr. Koenig lays out, and the case management approach isn't the unbelievable, confusing approach that he lays out. Is it the nightmare that the Second Circuit classified some other case? No, it isn't. How is this factually different than Isaacs v. Sprint? It's similar to the Sprint case, except it's not 50 states, it's 8 states. That's the fundamental difference. Wasn't there some language in there? I think I remember about it being just a class action nightmare. Didn't they use the word nightmare in there somehow? That's what Judge Posner said. There's an important procedural point there. The opinion that he issued dealt with a class certification in federal court in the Southern District involving Sprint, a 50-state certification, where Judge Posner specifically found the judge didn't make the required class certification findings. The order was defective. He also created a fail-safe class. That's the holding of the poor v. Sprint case, fail-safe class and a failure to enter the correct findings. He then in dicta says this is a nightmare of a class action. He did that on a Rule 23-F motion where there was a petition filed 20 pages long. Not a lawful exhibit, not a lawful record as we had in front of the Southern District. We responded to the petition purely on procedural grounds and said there's no basis to take this Rule 23-F appeal up. Judge Posner decided not only am I taking the appeal, but while I'm here I'm going to rule on this without briefing. We never had a chance to make these arguments in the Southern District. So that's another important distinction. Quoting from that case, and this seems to be what opposing counsel tried to allude to earlier, it says this is hardly a case in which class action treatment is obviously appropriate. Quite the contrary, it seems decidedly inappropriate. The case involves different conveyances by and to different parties made at different times over a period of more than a century. It goes on and on and on, kind of quoting what opposing counsel said. I agree, Judge Posner. Can you address why we shouldn't be persuaded by Isaacs to some degree? Yes, and I want to get to the case management point, which will describe how this case can be handled, why this isn't an array of individual issues with no common issues, but just the opposite. Judge Posner didn't have the benefit of briefing or argument, he didn't have any argument on that point. He did not have the record before him that you have in front of you, and he never heard these arguments about how the case should and could be managed. Judicial activism from the Seventh Circuit, then. No comment. The third defect, and then I'll get to the case management issues, which I agree are essential. Quest ignores the fact that the alternative, if you and other courts refuse to allow classes like this to be certified and adjudicated, the alternative is they get away with that conduct. Now, the argument that Quest makes is essentially that what we did is so large, so pervasive, so complicated. We took so much property from so many people in so many parts of this country that you can't sort it out. It's a variation on the too big to fail theme. This is too complicated to unwind. So we get to walk away. That's extraordinary. That can't be the case that courts can't find a solution to this. These individual plaintiffs can't fight a behemoth like Quest. They'll be buried. They'll be overwhelmed. This is what the class action mechanism is designed for, and the courts can find a way to structure a class action and manage these issues and get to a result. It's also important on this point to recognize the public record that is referenced in the brief. Quest has tried to settle, just like AT&T settled all of its claims nationwide, covering roughly 9,000 miles. They had a class certified against them, first in state court, then removed to federal court. Is some of the property held by the railroads in fee? Yes. Therefore, they could do whatever they wanted to with that particular parcel in? Absolutely. The question is, are there railroad easements at issue here? And we agree that there are. The question is, which of these parcels involve easements, and what is that trespass worth? Are all the easements actionable, in your opinion? Yes. So other than the fee simple ownership, everything else is actionable as far as your class is concerned? Yes. And we believe, because of the centerline presumption with what we see at the moment, every class member has a colorable claim. It could be defeated. It may be proven that they don't own the interest. But at the outset, because they're an adjoining landowner, the centerline presumption, which is designed to avoid a situation where you have what's known as orphaned strips of land. So I sell property to you, and in my description I don't make it clear what the boundary is. I refer to the property as lying south of the right-of-way, for example. Now I move on, and 30 years later you sell the property. And then there's a dispute about the right-of-way. The person you sold it to is presumed to own to the centerline, because we don't want an orphaned strip that is later determined to still be owned by me because of the way I describe the property and the conveyance. If I want to keep it, I've got to define it very clearly and make it quite clear in the deed I'm retaining the interest to myself. The centerline presumption, under that presumption, it's clear that all of the class members have a colorable claim. Maybe it will be defeated because the railroad shows I own the field. But at the outset of the case, everyone has a valid cause of action subject to those defenses. And I don't want to blab your point, but whose burden is it to would it be your client's burden to show their ownership in the property? That's an issue the circuit court didn't decide, and we have a differing view. We believe it's our burden to show we own the adjoining or underlying property. It's a little terminology issue. When we say adjoining, we mean the class members who live along the right-of-way on the cable side. They're adjoining. We say they're also underlying owners because they own the feed below the railroad right-of-way. But for shorthand purposes, we'll refer to them as adjoining owners. Because of the centerline presumption, they're assumed to own the feed, not just the adjoining parcel, but all the way to the centerline of the railroad right-of-way. Our view is that once they've established they're the adjoining owner, because of the presumption, they're presumed to own. So we're to presume that they own the feed then? Yes, that can be rebutted by Quest if they can show we've got a railroad source document. We got our interest from the railroad. The railroad owns it. Here's the source document from 1872, railroad bought a feed. And if they can show that source document, that claimant will lose. So in your pleadings, you're pleading that all of the class owns it and feeds it? We plead that they are presumed to. But we recognize, we know enough about this from other people. And it's their responsibility to show that they have superior ownership or superior rights? That the railroad that they're relying on, if they entered into an agreement with, had a valid right to convey that interest to Quest. If they didn't go to the trouble of determining that at the outset, we think they should be put to the burden of proof now to prove that they've got a valid right to occupy that land. If they can't prove it, our presumption prevails and our claim is valid. That's our view. That's kind of different in a normal trespass, don't you have to show that you're the owner of the property? In our view, based on the centerline presumption, if the trespass involves a railroad right-of-way, we don't. If we prove that we're the adjoining owner trespasser, if they're relying on the rights they receive from another property owner, they're going to have to demonstrate the basis for the validity of those rights. So the point I wanted to make about settlements, Your Honor, is an important point. Not only has AT&T settled claims nationwide, involving a process where we sorted out fees and easements, and the people who had easements got paid, the people where the railroad had a fee, they didn't get paid. We had an administrative process for doing that. Quest, Level 3, and Sprint wanted to do the same thing in Boston. The federal judge there found that under his interpretation of the local action doctrine, which Quest and us disagree with, and which is not the rule of the Seventh Circuit or in Illinois, that he couldn't preside over a 50-state set of settlements. So he tossed that out on procedural grounds. Before he did, they were on record as saying, we're going to pay $20 million in administrative costs, $41.5 million in attorney's fees, and we're going to put $127 million at issue for payments to these class members, assuming everybody makes a claim and collects their benefits. $127 million. At a 100% claims rate, that was the guaranteed payout. These aren't nominal claims. These aren't trumped-up claims. These are real claims. There are real trespasses here. There is liability, and there are damages. And if they get away with it on these procedural grounds, by their argument that we took so much, we made it so complicated, you can't fix it now, what are they going to do the next time when they want to extend their network to a new area, when they want to put in the next generation of fiber optic cable or whatever new technology they and their cohorts come up with for the next generation of communications? What are their attorneys going to tell them to do? Go ahead and put it in. Take it. Courts can't do anything about it.  Mr. Malia, I'm sorry. No, go ahead. What about the consideration of limiting the class to the state of Illinois to avoid conflict of law, choice of law issues? What do you have to say about that? We think that should be deferred to the circuit court for this reason. Parties disagree on whether there is uniformity on things like the scope of these or the interpretation of these. Land-grant, for example, certainly doesn't vary from state to state. Federal land-grants will be interpreted consistent with federal law. But if the circuit court finds, after the judge gets into this case and begins hearing these issues, the judge could certainly say, hold on, now you presented to me that there would be uniformity and that the differences could be managed by subclassing. Maybe five states are treated under this set of rules and three states are treated under this set of rules. You're wrong. All eight states are different. This is too complicated. I'm decertifying except as defined. Does the judge reserve the right to do that? It certainly can do that if it turns out to be as complicated as Quest says from state to state. We don't believe it will be. How do you propose the damages be ascertained? Is that even an issue we've got to address now? That is clearly a common issue on the measure of damages. By that I mean we have a view that the right approach here is to say, what did Quest get for it? What they got was the ability to connect long haul routes point to point, from city to city. That's what these routes are for. That had a value to Quest, a value that they paid the railroads on a linear foot basis, so many dollars per foot. That's what those payments for the railroads were based on. We think the same approach applies here. These landowners had something that Quest wanted, the ability to get through their property as part of a connected network. That's the way to value this. Now Quest says, no, no, no. You have to go through and do a parcel by parcel appraisal. That's a common issue. The circuit court should decide that issue. If the circuit court agrees with us, then the measure of damages will be based on experts who will testify what the value of that connectivity is. So Quest has paid the various railroads an excellent amount of dollars to lay the table. You want to use the amount that they paid there as some measure of damages that correlate to each individual's own. That would be a guide, as would other similar agreements between railroads and telecoms and others. If Quest is right, but it really does have to be done on a parcel by parcel basis, if the circuit court agrees with that, we presume the circuit court will decertify as to damages, and the class members then, with a liability determination in their pockets, can pursue individual damage claims if they see fit. On the predominance question, I've touched on a little bit of that already, but let me dive into it more directly. We think the right way to look at this is as a pyramid. If you think of all the issues that are discussed in the brief in a pyramid shape, Quest says the only way to solve this is to go down to the base of the pyramid, find a claimant, pull that claim out, adjudicate the whole thing, talk about every possible issue that relates to that one individual claim, then go to the next claim at the base of the pyramid, do the same thing. That's not a class action procedure. It's the antithesis of a class action procedure. Let's go to the top of the pyramid, identify the issues that are common to all class members. There are some issues that are common not to all, but to a significant subset of class members. Let's resolve those issues once so that they can be applied to all claims where they reappear. Will there be some individual issues at the end of the day? It's certainly possible. There may be claimants out there who gave an individual easement to Quest for telecommunications purposes. That may have to be dealt with on an individual basis. But the bulk of the issues and the bulk of the time and effort that will be spent on this case will be on the common issues. Let me briefly explain what the principal common issues are. First of all, the factual history, and I've talked about that. We've spent a considerable amount of time on that, and that is the top of the pyramid issue. The scope of easements that Mr. Koenig talked about. It is a fallacy to suggest that there are disputed facts. They said in their brief that railroad right-of-way easements, the scope of those easements, quote, almost always include telecommunications use. Those are their words. That's what this whole dispute is based on. Their contention is, well, we didn't really need to look at all these individual plaintiffs that were class members and what rights they held, because even if the railroad just had an easement for railroad purposes, that's good enough. That's so broad. You can put telecommunications cable in there. You don't need to talk to the adjoining landowner. Let's test that theory. We don't think there's anything in dispute. We all agree those easements are part of this class. We all agree that a railroad easement is an easement for railroad purposes. The question is, and there's a plethora of case law nationwide on what that means, how broad is that, and does it include West commercial telecommunications installation? If it does, we lose. The whole case goes away. Talk about a common issue. If we lose that issue, the case is done. Are there any old cases on the telegraphs or anything, whether or not the telegraph companies had to pay the landowners over the, it seemed like the railroad right-of-ways were where the telegraph poles went. Is there any cases on that? Your Honor, you won't be surprised to hear there are lots of cases, including U.S. Supreme Court cases, and they are fascinating. They go back to the 1800s. The key distinction, in our view, and this is something we'd have to argue to the circuit court, the key distinction is those telegraph easements were designed to assist the railroads in the switching operations and their point-to-point communications. It was a railroad-related use. When the railroads tried to take those telegraph uses and sell it commercially to make money that had nothing to do with the operation of the railroad, the Supreme Court and various state courts said, You can't do that. That's not a railroad use anymore. Now it's a separate commercial use, and that's what this is. We agree that railroads could have put telecom fiber in for their own communication purposes to run the operation more efficiently, but they couldn't turn around and build their own fiber-optic telecommunications network if they're not a railroad worker. That's the difference. Thank you, Mr. Malayo. Thank you. Mr. Koenig, do you have rebuttal? I'm sure you do. I want to respond first to this argument that Quest's conduct is somehow even wrongful, much less egregious. Remember, there are 12,500 members of this class, and this is as simple as plaintiffs indicate. You would think they would have found one, one class member out of these 12,500, where they could say, Look, here is an easement. This deed is clearly an easement. It says we hereby convey the property as an easement and where it's clearly limited to railroad purposes, where it says this is an easement for operating a railroad train or for laying railroad tracks. Instead, they found two plaintiffs. Neither one of them has a claim. And that suggests, I submit, that that is going to be the universe. It would not have been difficult. They didn't even need the cooperation of class members. These were all public records. So if, in fact, they were egregious conduct by Quest, why don't they prove it? Why don't they just give at least one of the 12,500 whom they could point to and say, See, what Quest did to that person? They haven't presented one. Did you all make the argument before the trial court that these two plaintiffs, the named plaintiffs, were not representative of the proposed class? Yes, we did. And how did the trial court, or how did the opposing counsel, I'll give you a chance to ask him that, how did he respond to that argument? Obviously, the trial court did not agree with you. No, actually, it wasn't. Well, the trial court, there was no response. That was the interesting thing. We made the argument, and it was effectively ignored by plaintiffs. And the trial court said, You know, you should have raised this with a summary judgment motion. So you're saying the trial court didn't address that issue either? Just said, Look, this isn't right. This should have been addressed with a summary judgment motion. So we filed a summary judgment motion. And we presented the same thing. And the court said, You know what? I don't have to decide this, and I won't decide this until after the common issues are decided. Well, that's the point I want to get to. I think you were inquiring about, Well, how are damages going to be tried? You can hear they want punitive damages. How does that happen? You have to prove two things to get punitive damages. First, you have to prove viability. And then secondly, you have to prove outrageous conduct. But there has to be this predicate. Well, how do they prove viability? And if by chance there is, say, 1 or 5 or 10, doesn't that matter that there's a tiny little number where there was a trespass? So how does this jury consider this issue? What evidence comes in so that the jury has some understanding of whether punitive damages are allowed? To do it, you've got to present all of this evidence. But we're not making up stuff. This is exactly what the case turns on, is these deeds and the language in them and the easements and the language in them. And, in fact, on this issue of railroads, railroads use these fiber-optic cables for their purposes. So there's this whole issue of, well, is it a railroad purpose, when, in fact, some of these railroads use the fiber-optic cable just like they use the telegraph for railroad purposes. I certainly want to make sure you understand that the law on telegraphs is quite a bit different. There is lots of case law suggesting that the railroad right-of-way could properly be used for telegraph and then currently can be used for telephone and later forms of communication. But in any event, how do you try this case? Even the damages, which they're very anxious to have tried by a jury. You have to have the predicate of misconduct, and you have to know who was wrong. And to know who was wrong, you have to look at whether they can find one, which they haven't yet, one person who was... where there's clearly some easement that does not embrace this kind of installation of fiber-optic cable. So you cannot just somehow push all those issues somewhere else or, as the court tried to do, with our own motion for sum of judgment, have that decided. Can you imagine if we don't get our motion for sum of judgment decided until after damages? How does that work? A couple of other issues on the alleged massive amount of these settlements. In the eight states we're concerned about here, for non-federal land grant, which is the bulk of the land, say in Ohio, the agreed-upon settlement was 77 cents per lineal foot. You own 100 feet, you get $77. In Kentucky, $1.03. These are not large amounts. If it's federal land grant, it's either 26 cents a lineal foot or 52 cents a lineal foot. So the notion that somehow there's been this egregious misconduct that we're willing to pay a substantial amount for is emphatically untrue. This Isaac B. Sprint case is not in any way distinguishable. The only difference is it was in many states as close to just eight. We cited 22 federal court cases that have looked at this exact fact. Fiber-optic cable and railroad right-of-way. Twenty-two out of 24 have held that those kinds of cases are simply the individual issues predominating. Unless you have further questions, thank you very much. Thank you, Mr. Kornick. Thank you, Mr. Malayo. Thank you, gentlemen. We'll take the matter under advisement and under ruling in due course.